**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 7, 2018

Philip Urofsky, Esq.
Shearman & Sterling LLP
401 9th Street, NW
Washington, DC 20004

**Re:   Zürcher Kantonalbank – Deferred Prosecution Agreement**

Dear Mr. Urofsky:

Pursuant to our discussions and written exchanges, the Office of the United States Attorney for the Southern District of New York (the "Office") and defendant Zürcher Kantonalbank ("ZKB"), under authority granted by its Board of Directors in the form of a Board Resolution (a copy of which is attached hereto as Exhibit A), hereby enter into this Deferred Prosecution Agreement (the "Agreement"). The Agreement has been approved by the Tax Division of the United States Department of Justice (the "Tax Division").

This Agreement shall take effect upon its execution by both parties.

**The Criminal Information**

1.      ZKB consents to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of New York (the "Court"), charging ZKB with conspiring with others, including U.S. taxpayers, in violation of Title 18, United States Code, Section 371, to (1) defraud the United States and an agency thereof, to wit, the United States Internal Revenue Service (the "IRS"), (2) to file false federal income tax returns in violation of Title 26, United States Code, Section 7206(1), and (3) to evade federal income taxes in violation of Title 26, United States Code, Section 7201. A copy of the Information is attached hereto as Exhibit B.

**Acceptance of Responsibility**

2.      ZKB admits and stipulates that the facts set forth in the Statement of Facts, attached hereto as Exhibit C and incorporated herein, are true and accurate. In sum, ZKB admits that it is responsible under U.S. law for the federal criminal violations charted in the Information and set forth in the Statement of Facts as a result of the acts of its officers, directors, employees and agents.

Philip Urofsky, Esq.
Page 2

3.     ZKB further admits and stipulates that the acts labeled "overt acts" and set forth in Paragraph 11 of the Information in fact took place.

## Restitution, Forfeiture and Penalty Obligations

4.     As a result of the conduct described in the Information and the Statement of Facts, ZKB agrees to make payments in total of $98,533,560 to the United States. Specifically, ZKB agrees to (1) make a payment of restitution in the amount of $39,142,000 (the "Tax Restitution Amount"), (2) forfeit to the United States $24,266,300 (the "Forfeiture Amount"), and (3) pay a penalty of $35,125,260 (the "Penalty Amount") to the U.S. Department of Justice (the "Department"), as set forth below.

5.     In regard to the Tax Restitution Amount, ZKB admits that the Tax Restitution Amount represents the approximate unpaid pecuniary loss to the United States as a result of the conduct described in the Statement of Facts. The Tax Restitution Amount shall not be further reduced by payments that have been made or may be made to the United States by U.S. taxpayers through the Offshore Voluntary Disclosure Initiative and similar programs (collectively, "OVDI") before or after the date of this Agreement. ZKB agrees to pay the Tax Restitution Amount to the IRS by wire transfer within seven (7) days of the date of the execution of this Agreement. If ZKB fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 18 and 19, below.

6.     In regard to the Forfeiture Amount, ZKB agrees that the Forfeiture Amount represents a substitute *res* for gross fees paid to ZKB by U.S. taxpayers with undeclared accounts at ZKB from January 1, 2002, through approximately December 31, 2013, and is subject to civil forfeiture to the United States as proceeds of mail and wire fraud pursuant to 18 U.S.C. § 981(a)(1)(C).

7.     ZKB further agrees that this Agreement, the Information and the Statement of Facts may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint"), a copy of which is attached hereto as Exhibit D, that will be filed against the Forfeiture Amount. By this Agreement, ZKB expressly waives any challenge to that Civil Forfeiture Complaint and consents to the forfeiture of the Forfeiture Amount to the United States. ZKB agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Forfeiture Amount and will not assist a third party in asserting any claim to the Forfeiture Amount. ZKB also waives all rights to service or notice of the Civil Forfeiture Complaint.

8.     The Forfeiture Amount shall be sent by wire transfer to a seized asset deposit account maintained by the United States Department of the Treasury within seven (7) days of the execution of this Agreement. If ZKB fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 18 and 19, below.

Philip Urofsky, Esq.
Page 3

9.     The Office and ZKB agree that, consistent with the factors set forth in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3572(a), and in light of the Forfeiture Amount and the Tax Restitution Amount, the Penalty Amount of $35,125,260 is an appropriate penalty in this case. ZKB agrees to pay the Penalty Amount as directed by the Office within seven (7) business days of the date of the execution of this Agreement.  The Penalty Amount represents a reduction of approximately 50% from the low end of the fine range that the parties agree would be applicable under the United States Sentencing Guidelines if ZKB had been convicted and sentenced for its criminal conduct. The Office and ZKB agree that the Penalty Amount is appropriate in mitigation of a higher penalty, in light of ZKB's substantial cooperation with this Office and taking into account the nature and seriousness of ZKB's conduct.  ZKB acknowledges, however, that the Office views as inconsistent with a policy of full cooperation the actions taken by ZKB with respect to bankers Stephan Fellmann and Christof Reist, as set forth in the attached Statement of Facts, and that the degree of mitigation in the Penalty Amount reflects those views.  The Penalty Amount is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Office that the Penalty Amount is the maximum penalty that may be imposed in any future prosecution, and the Office is not precluded from arguing in any future prosecution that the Court should impose a higher penalty.

10.     Upon payment of the Forfeiture Amount, ZKB shall release any and all claims it may have to such funds and execute such documents as necessary to accomplish the forfeiture of the funds. ZKB agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Forfeiture Amount or the payment of the Penalty Amount and will not assist a third party in asserting any claim to the Forfeiture Amount or the Penalty Amount.

11.     ZKB agrees that the Tax Restitution Amount, the Forfeiture Amount, and the Penalty Amount shall be treated as non-tax-deductible amounts paid to the United States government for all tax purposes under United States law.  ZKB agrees that it will not claim, assert, or apply for, either directly or indirectly, a tax deduction, tax credit, or any other offset with regard to any United States federal, state, or local tax, for any portion of the $98,533,560 that ZKB has agreed to pay to the United States pursuant to this Agreement.

**Obligations to Cooperate**

12.     ZKB agrees, subject to applicable laws or regulations, to cooperate fully with the Department and the IRS, and any other governmental agency designated by the Office regarding any matter relating to the Department's investigation about which ZKB has information or knowledge.

13.     It is understood that ZKB shall, subject to applicable laws or regulations, (a) truthfully and completely disclose all information with respect to the activities of ZKB, its officers and employees, and others concerning all such matters about which this Office inquires related to this Office's investigation, which information can be used for any purpose, except as limited by this Agreement; (b) cooperate fully with the Department, the IRS, and any other law enforcement agency so designated by this Office; (c) consent to the production to the Department

Philip Urofsky, Esq.
Page 4

of any document, record, or other tangible evidence; (d) specifically provide, upon request, all items, assistance, information and documents required to be produced by Swiss banks participating in the Program for Non-Prosecution Agreements or Non-Target Letters for Swiss Banks (the "Program") as set forth specifically in Parts II.D.1, 2 and 4 and Part II.F of the Program; (e) undertake the retention of records as set forth in Parts II.D.5 and II.E of the Program; (f) implement the closure of recalcitrant accounts and related procedures, to the extent that it has not already done so, as set forth in Part II.G of the Program; (g) shall, at the Department's request, use its best efforts to secure the attendance and truthful statements or testimony of any officer, agent, employee, or former officer, agent or employee, at any meeting or interview or before the grand jury or at any trial or other court proceeding; and (h) shall commit no crimes whatsoever. For purposes of this Agreement, the Applicable Period, as defined in the Program, shall be extended to December 31, 2017. It is further understood that ZKB will bring, subject to applicable laws or regulations, to this Office's attention (a) all criminal conduct by, and criminal investigations of, ZKB or its employees related to any violations of the federal laws of the United States that come to the attention of ZKB's board of directors, executive board, or senior management, and (b) any administrative or regulatory proceeding or civil action brought or investigation conducted by any U.S. governmental authority that alleges fraud by ZKB or any other violations of the federal laws of the United States in the operation or management of ZKB's business.

### Deferral of Prosecution and Duration of the Agreement

14.     The actions ZKB has taken to date demonstrate acceptance and acknowledgment of responsibility for its conduct, including, among other things, implementing remedial measures before it became aware it was the subject of a U.S. law enforcement investigation; conducting a thorough internal investigation; and providing the Office with facts, including unfavorable ones, discovered during the course of that internal investigation. ZKB has also made a commitment to: (a) accept and acknowledge responsibility for its conduct, as described in the Statement of Facts and the Information; (b) cooperate with the Department and the IRS; (c) make the payments specified in this Agreement; (d) comply with the federal criminal laws of the United States (as provided herein in Paragraph 13); and (e) otherwise comply with all of the terms of this Agreement. In consideration of the foregoing, the Office shall recommend to the Court that prosecution of ZKB on the Information be deferred for three years from the date of the signing of this Agreement. ZKB shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect.

15.     ZKB agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for three years from the date of the Court's acceptance of this Agreement, unless otherwise extended pursuant to Paragraph 18 below (the "Deferral Period"). ZKB's obligation to cooperate is not intended to apply in the event that a prosecution against ZKB by this Office is pursued and not deferred.

Philip Urofsky, Esq.
Page 5

16.     The Office agrees that if ZKB is in compliance with all of its obligations under this Agreement, the Office will, at the expiration of the Deferral Period (including any extensions thereof), seek dismissal with prejudice of the Information filed against ZKB pursuant to this Agreement. Except in the event of a violation by ZKB of any term of this Agreement or as otherwise provided in Paragraph 18, the Office will bring no additional charges or other civil action against ZKB relating to its conduct as described in the admitted Statement of Facts. This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than ZKB and its affiliated entities. ZKB and the Office understand that the Agreement to defer prosecution of ZKB must be approved by the Court, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to approve the Agreement to defer prosecution for any reason: (a) both the Office and ZKB are released from any obligation imposed upon them by this Agreement; (b) this Agreement shall be null and void, except for the tolling provision set forth in Paragraph 18, below; and (c) if they have already been transferred to the United States, the Tax Restitution Amount, Forfeiture Amount and Penalty Amount shall be returned to ZKB.

17.     ZKB agrees that, in the event that the Office determines during the Deferral Period described in paragraph 15 above (or any extensions thereof) that ZKB has violated any provision of this Agreement, an extension of the period of the Deferral Period may be imposed in the sole discretion of the Office, up to an additional year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four (4) years.

**Additional Provisions**

18.     It is understood that should the Office in its sole discretion determine that ZKB: (a) has knowingly given false, incomplete, or misleading information either during the term of this Agreement or in connection with the Office's investigation of the conduct described in the Information or Statement of Facts; (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement; or (c) otherwise violated any provision of this Agreement, ZKB shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation, or suit for any civil cause of action, of which the Office has knowledge, including but not limited to a prosecution or civil action based on the Information, the Statement of Facts, the conduct described therein, or perjury and obstruction of justice. Any such prosecution or civil action may be premised on any information provided by or on behalf of ZKB to the Department or the IRS at any time. In any prosecution or civil action based on the Information, the Statement of Facts, or the conduct described therein, it is understood that: (a) no charge would be time-barred provided that such prosecution is brought within the applicable statute of limitations period (subject to any prior tolling agreements between the Office and ZKB), and excluding the period from the execution of this Agreement until its termination; and (b) ZKB agrees to toll, and exclude from any calculation of time, the running of the statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to Paragraph 17 above. By this Agreement, ZKB expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any

Philip Urofsky, Esq.
Page 6

constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing, voluntary, and in express reliance on the advice of ZKB's counsel.

19.     It is further agreed that in the event that the Office, in its sole discretion, determines that ZKB has violated any provision of this Agreement, including by failure to meet its obligations under this Agreement: (a) all statements made by or on behalf of ZKB to the Office, the Department, or the IRS, including but not limited to the Statement of Facts, or any testimony given by ZKB or by any agent of ZKB before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Office against ZKB; and (b) ZKB shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of ZKB before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence. It is the intent of this Agreement to waive any and all rights in the foregoing respects.

20.     ZKB, having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement. Consistent with this provision, ZKB may raise defenses and/or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not contradict the Statement of Facts or such representations. Any such contradictory statement by ZKB, its present or future attorneys, agents, or employees shall constitute a violation of this Agreement and ZKB thereafter shall be subject to prosecution as specified in paragraphs 18 and 19, above, or the deferral-of-prosecution period shall be extended pursuant to paragraph 17, above. The decision as to whether any such contradictory statement will be imputed to ZKB for the purpose of determining whether ZKB has violated this Agreement shall be within the sole discretion of the Office. Upon the Office's notifying ZKB of any such contradictory statement, ZKB may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within forty-eight (48) hours after having been provided notice by the Office. ZKB consents to the public release by the Office, in its sole discretion, of any such repudiation. Nothing in this Agreement is meant to affect the obligation of ZKB or its officers, directors, agents, or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

21.     ZKB agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in paragraphs 18 and 19 above, or instead to choose to extend the period of deferral of prosecution pursuant to paragraph 17. ZKB understands and agrees that the exercise of the Office's discretion under this Agreement is unreviewable by any court. Should the Office determine that ZKB has violated this Agreement, the Office shall provide notice to ZKB of that determination and provide ZKB with an opportunity to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the violation has been cured by ZKB.

Philip Urofsky, Esq.
Page 7

22.    It is understood that ZKB contends that it has jurisdictional arguments and defenses that it could raise to support a claim that it is not subject to prosecution for any criminal offense in the courts of the United States.  By entering into this Agreement, ZKB does not prospectively waive these arguments or defenses and it reserves the right to assert any applicable jurisdictional argument or defense in any prosecution or civil action by the United States.

23.    ZKB agrees that it will not take any adverse actions against any ZKB employees as a result of their assistance to the Department in the investigation of the conduct described in the Statement of Facts.

### Limits of the Agreement

24.    It is understood that this Agreement is binding on the Office and the Tax Division, but does not bind any other components of the Department, any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities.  However, if requested by ZKB or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, this Agreement, the cooperation of ZKB, and ZKB's compliance with its obligations under this Agreement.

### Public Filing

25.    The Office and ZKB agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of New York.

26.    The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

### Execution in Counterparts

27.    This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

Philip Urofsky, Esq.
Page 8

### Integration Clause

28.     This Agreement sets forth all the terms of the Deferred Prosecution Agreement between ZKB and the Office.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, ZKB's attorneys, and a duly authorized representative of ZKB.

Dated: New York, New York
        August 7, 2018

                        Very truly yours,

                        GEOFFREY S. BERMAN
                        United States Attorney

                        By: _____
                        Sarah E. Paul
                        Noah Solowiejczyk
                        Andrew D. Beaty
                        Assistant United States Attorneys
                        (212) 637-2200

                        APPROVED:


                        _____
                        Lisa Zornberg
                        Chief, Criminal Division


Accepted and agreed to:

_____                    13 Aug 2018
Dr. Tom Fischer                                    Date
General Counsel, Zürcher Kantonalbank

_____                    13 Aug 2018
Philip Urofsky, Esq.                               Date
Attorney for Zürcher Kantonalbank

                                        SO ORDERED: 8/13/2018

                                        _____
                                        J. PAUL OETKEN
                                        U.S.D.J.

# Exhibit A
# to the Deferred
# Prosecution Agreement

**EXHIBIT A TO DEFERRED PROSECUTION AGREEMENT**

**CERTIFICATE OF CORPORATE RESOLUTION OF THE BOARD OF DIRECTORS OF ZÜRCHER KANTONALBANK**

We, Dr. Jörg Müller-Ganz, Chairman of the Board of Directors of Zürcher Kantonalbank, a public law entity duly organized and existing under the laws of Switzerland (**ZKB**), and Françoise Niemeyer, acting corporate secretary of ZKB, do hereby certify that the following is a complete and accurate copy of a resolution adopted by the Board of Directors of ZKB at its extraordinary meeting of August 9, 2018, following a duly held meeting on June 28, 2018:

1. That the board of directors of ZKB:

   a) has thoroughly reviewed and understands the Deferred Prosecution Agreement attached hereto, including the Criminal Information, Statement of Facts, and Civil Forfeiture Complaint, attached respectively as Exhibits B, C, and D to the Deferred Prosecution Agreement;

   b) has consulted with U.S. and Swiss legal counsel in connection with this matter, including with respect to ZKB's rights, possible defenses, the relevant United States Sentencing Guidelines provisions, and the consequences of entering into the Deferred Prosecution Agreement;

   c) is fully satisfied with its attorneys' representation during all phases of the investigation and the resolution of this matter;

   d) acknowledges the unanimous approval of the Deferred Prosecution Agreement by ZKB's management board and its request that the Board of Directors vote to enter into the Deferred Prosecution Agreement;

   e) has unanimously voted to enter into the Deferred Prosecution Agreement, including:

      i) consenting to the filing of a one-count criminal information in the United States District Court for the Southern District of New York, charging ZKB with conspiring with others, including U.S. taxpayers, in violation of Title 18, United States Code, Section 371, to (1) defraud the United States and an agency thereof, to wit, the United States Internal Revenue Service, (2) to file false federal income tax returns in violation of Title 26, United States Code, Section 7206(1), and (3) to evade federal income taxes in violation of Title 26, United States Code, Section 7201;

      ii) waiving indictment on this charge; and

      iii) to make payments totaling USD 98,533,560 as follows:

(1) to make a payment of restitution in the amount of USD 39,142,000 to the United States Internal Revenue Service, representing the approximate unpaid pecuniary loss to the United States as a result of the conduct described in the Statement of Facts;

(2) to forfeit an amount of USD 24,266,300 to the United States Department of the Treasury for fees earned by ZKB as a result of the conduct described in the Statement of Facts; and

(3) to pay a penalty in the amount of USD 35,125,260 as directed by the United States Attorney for the Southern District of New York.

2.  That Rudolf Sigg, Chief Financial Officer of ZKB, and Dr. Thomas Fischer, General Counsel of ZKB, are hereby authorized, either individually or collectively, (i) to execute the Deferred Prosecution Agreement on behalf of ZKB substantially in such form as reviewed by the Board of Directors with such non-material changes as each of them may approve; and (ii) to take, on behalf of ZKB, all actions as may be necessary or advisable in order to carry out the foregoing; and

3.  That Philip Urofsky, Esq., Shearman & Sterling LLP, is hereby authorized to sign the Deferred Prosecution Agreement in his capacity as ZKB's U.S. counsel.

We further certify that the above resolution has not been amended or revoked in any respect and remains in full force and effect.

IN WITNESS WHEREOF, we have executed this Certification this August 10, 2018.


Dr. Jörg Müller-Ganz
Chairman

Françoise Niemeyer
Secretary

**Official Certification**

Seen for authentication of the reverse side signatures, affixed in our presence by

Mr. **Dr. Jörg Thomas MÜLLER**, Swiss citizen of Bülach ZH, in Bülach, Switzerland, identified by identity card,

Ms. **Françoise Jeannette NIEMEYER**, Swiss citizen of Wettingen AG, in Wettingen, Switzerland, identified by identity card,

who are entered in the Register of Commerce of the Kanton of Zurich as chairman of the board of directors with the right to sign jointly by two (Jörg Thomas Müller) resp. as acting corporate secretary of the board of directors with the right to sign jointly by two (Françoise Jeannette Niemeyer) for the

**Zürcher Kantonalbank**, public corporation with registered head office in Zürich ZH.

The inspection of the commercial register has taken place directly before the official certification by internet inquiry.

Zürich, 10th August 2018
BK no. 4479-84/ems
Fee CHF 60.00

**NOTARIAT ZÜRICH (ALTSTADT)**

M. Müller-Smit, Notary Public

---

**APOSTILLE**
(Convention de la Haye du 5 octobre 1961)

1. Land: Schweizerische Eidgenossenschaft, Kanton Zürich
   Country: Swiss Confederation, Canton of Zürich
   Diese öffentliche Urkunde / This public document

2. ist unterschrieben von
   has been signed by          Markus Müller–Smit

3. in seiner Eigenschaft als
   acting in the capacity of    Notary Public

4. sie ist versehen mit dem Stempel/Siegel des (der) — bears the stamp/seal of
   Notariat Zürich (Altstadt) Kt. Zürich

   Bestätigt / Certified
5. In / at 8090 Zürich / Zurich      6. am / the   10.08.2018
7. durch die Staatskanzlei des Kantons Zürich
   by the Chancellery of State of the Canton of Zurich
8. unter Nr. / under N°.  1122829/2018
9. Stempel/Siegel, Stamp/seal.   10. Unterschrift / Signature

S. Hanselmann

# Exhibit B
# to the Deferred
# Prosecution Agreement

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x
                                 :
  UNITED STATES OF AMERICA
                                 :       INFORMATION
        - v. -
                                 :       S1 12 Cr. 962 (JPO)
  ZÜRCHER KANTONALBANK,
                                 :

                                 :
          Defendant.             :

- - - - - - - - - - - - - - - x

## COUNT ONE
(Conspiracy)

The United States Attorney charges:

### Zürcher Kantonalbank

1.   At all times relevant to this Information,
ZÜRCHER KANTONALBANK ("ZKB"), the defendant, provided private
banking, asset management, and other services to individuals and
entities around the world, including U.S. taxpayers in the
Southern District of New York.

### Obligations of U.S. Taxpayers
### With Respect to Foreign Financial Accounts

2.   At all times relevant to this Information,
citizens and residents of the United States who had income in
any one calendar year in excess of a threshold amount ("U.S.
taxpayers") were required to file a U.S. Individual Income Tax
Return, Form 1040 ("Form 1040"), for that calendar year with the

Internal Revenue Service ("IRS").  On Form 1040, U.S. taxpayers were obligated to report their worldwide income, including income earned in foreign bank accounts.  In addition, when a U.S. taxpayer completed Schedule B of Form 1040, he or she was required to indicate whether "at any time during [the relevant calendar year]" the filer had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account," and if so, the U.S. taxpayer was required to name the country.

3.   In addition, U.S. taxpayers who had a financial interest in, or signature or other authority over, a foreign bank account with an aggregate value of more than $10,000 at any time during a particular calendar year were required to file with the IRS a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 ("FBAR") on or before June 30 of the following year.  In general, the FBAR required that the U.S. taxpayer filing the form identify the financial institution with which the financial account was held, the type of account (either bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR was being filed.

4.   The regulations relating to the required

2

disclosure of foreign bank accounts specifically precluded U.S.

taxpayers from having foreign accounts nominally held by sham

corporate structures as a means of avoiding disclosure.

Specifically, as set forth in Title 31, Code of Federal

Regulations, Section 1010.350(e)(3):

> A United States person that causes an entity,
> including but not limited to a corporation,
> partnership, or trust, to be created for a
> purpose of evading this section [requiring
> generally the disclosure of offshore financial
> accounts containing over $10,000 and over
> which a U.S. taxpayer has signature or other
> authority] shall have a financial interest in
> any bank, securities, or other financial
> account in a foreign country for which the
> entity is the owner of record or holder of
> legal title.

### Overview of the Conspiracy

5.    From at least in or about 2002 up through and

including in or about 2009, numerous U.S. taxpayer-clients

conspired with ZKB, the defendant, and others known and unknown,

to defraud the United States, to conceal from the IRS the

existence of bank accounts held by U.S. taxpayer-clients at ZKB

and the income earned in these accounts (hereafter "the

undeclared accounts"), and to evade U.S. taxes on income

generated in the undeclared accounts.  At its peak in or around

2008, ZKB conspired with U.S. taxpayer-clients to hide

approximately $794 million in assets from the IRS in accounts at

3

ZKB.

### Means and Methods of the Conspiracy

6.     Among the means and methods by which ZKB, the

defendant, and its co-conspirators carried out the conspiracy

were the following:

a.     ZKB opened and managed for U.S. taxpayer-

clients investment accounts at ZKB that were not reported to the

IRS on Forms 1040, FBARs, or otherwise, and the income from

which was also not reported to the IRS.

b.     ZKB permitted U.S. taxpayer-clients to open

undeclared accounts using code names so that the U.S. taxpayers

could sign their code names on bank documents, rather than use

their usual signatures, and otherwise ensure that the U.S.

taxpayer-clients' names would appear on the fewest possible

documents relating to their accounts.

c.     ZKB permitted U.S. taxpayer-clients to place

assets in undeclared accounts held in the name of sham entities,

i.e., structures that had no business purpose, in order to

conceal the U.S. taxpayer-clients' beneficial ownership of such

assets.

d.     ZKB ensured that account statements and

other records relating to undeclared accounts held at ZKB by

U.S. taxpayer-clients were not sent to these clients in the

4

United States.

    e. ZKB allowed U.S. taxpayer-clients to make structured withdrawals by checks from undeclared accounts in amounts of less than $10,000, in an attempt to conceal transactions from U.S. authorities.

    f. ZKB solicited business through the website www.swiss-bank-accounts.com, which was operated by a third party, and which resulted in the opening of accounts at ZKB for U.S. taxpayer-clients whose accounts were undeclared.

    g. ZKB caused U.S. taxpayer-clients with undeclared accounts at ZKB to travel from the United States to Switzerland in order to discuss their undeclared accounts.

    h. Various U.S. taxpayer-clients of ZKB, including taxpayer-clients in New York, New York, filed false Forms 1040 that failed to report their interest in, and income earned from, their undeclared ZKB accounts; evaded income taxes due and owing; and failed to file FBARs identifying their undeclared accounts.

## Statutory Allegations

    7. From at least in or about 2002 up through and including in or about 2009, in the Southern District of New York and elsewhere, ZKB, the defendant, together with others known and unknown, willfully and knowingly did combine, conspire,

confederate, and agree together and with each other to defraud

the United States of America and an agency thereof, to wit, the

IRS, and to commit offenses against the United States, to wit,

violations of Title 26, United States Code, Sections 7206(1) and

7201.

8.   It was a part and an object of the conspiracy

that ZKB, the defendant, together with others known and unknown,

willfully and knowingly would and did defraud the United States

of America and the IRS for the purpose of impeding, impairing,

obstructing, and defeating the lawful governmental functions of

the IRS in the ascertainment, computation, assessment, and

collection of revenue, to wit, federal income taxes.

9.   It was further a part and an object of the

conspiracy that various U.S. taxpayer-clients of ZKB, the

defendant, together with others known and unknown, willfully and

knowingly would and did make and subscribe returns, statements,

and other documents, which contained and were verified by

written declarations that they were made under the penalties of

perjury, and which these U.S. taxpayer-clients, together with

others known and unknown, did not believe to be true and correct

as to every material matter, in violation of Title 26, United

States Code, Section 7206(1).

10.   It was further a part and an object of the

conspiracy that ZKB, the defendant, together with others known and unknown, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income tax due and owing to the United States of America by certain of ZKB's U.S. taxpayer-clients, in violation of Title 26, United States Code, Section 7201.

## Overt Acts

11.   In furtherance of the conspiracy and to effect the illegal objects thereof, ZKB, the defendant, and others known and unknown, including ZKB relationship managers acting within the scope of their employment with ZKB, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about 2003, Otto Hüppi, a ZKB relationship manager and co-conspirator not named as a defendant herein, opened a new undeclared account for a U.S. taxpayer-client in the name of a sham entity.

b.   In or about June 2008, Hansruedi Schumacher, a senior employee of Neue Zürcher Bank ("NZB") and co-conspirator not named as a defendant herein, had a meeting with senior ZKB officials, in which it was made clear to those officials that many of the U.S. taxpayers who were closing their accounts at the Swiss bank UBS AG and opening new accounts at ZKB had

7

undeclared accounts and were not in compliance with their U.S. tax obligations.

        c.   In or about October 2008, an NZB employee, who is a co-conspirator not named as a defendant herein, mailed to one of ZKB's U.S. taxpayer-clients four checks drawn on ZKB's correspondent bank account in New York, New York, totaling approximately $30,000, with each check for an amount less than $10,000 to reduce the risk of the IRS discovering the client's undeclared account at ZKB.

        (Title 18, United States Code, Section 371.)

                                 *Geoffrey Berman*

                              GEOFFREY S. BERMAN
                              United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

ZÜRCHER KANTONALBANK,

Defendant.

### SUPERSEDING INFORMATION

S1 12 Cr. 962 (JPO)

(18 U.S.C. § 371.)

GEOFFREY S. BERMAN
United States Attorney.

# Exhibit C
# to the Deferred
# Prosecution Agreement

**Exhibit C to Deferred Prosecution Agreement with Zürcher Kantonalbank**

**Statement of Facts**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Southern District of New York ("USAO") and Zürcher Kantonalbank ("ZKB"). The parties agree and stipulate that the following information is true and accurate:

I.      **Background**

Founded in 1870 as a public-law institution in Zurich, Switzerland, ZKB was formed pursuant to the laws of the Canton of Zurich and is currently governed by an Act passed by the Zurich Parliament in 1997. During the relevant period, ZKB employed approximately 4,806 employees and operated about 103 branches in the Canton of Zurich. At all relevant times, as part of ZKB's business, ZKB provided private banking and asset management services to citizens and residents of the United States ("U.S. taxpayers"). As of December 31, 2009, ZKB held approximately CHF (Swiss francs) 133 billion in assets under management ("AUM"), which equates to approximately $129 billion. On average, from 2002 to 2009, ZKB maintained approximately 910,000 client relationships.

II.     **The Offense Conduct**

Overview

From at least in or about 2002 through in or about 2009, ZKB helped certain U.S. taxpayers with accounts at ZKB evade their U.S. tax obligations, file false federal tax returns with the Internal Revenue Service (the "IRS"), and otherwise hide accounts held at ZKB from the IRS (hereinafter, "undeclared accounts"). ZKB did so by opening and maintaining undeclared accounts for U.S. taxpayers at ZKB, and by allowing third-party asset managers to open undeclared accounts for U.S. taxpayers at ZKB. ZKB held approximately 2,000 undeclared accounts on behalf of U.S. taxpayer-clients, who collectively evaded over $39 million in U.S. taxes, between 2002 and 2013. In furtherance of a scheme to help U.S. taxpayers hide assets from the IRS and evade taxes, ZKB undertook, among other actions, the following:

- ZKB entered into approximately 349 "code word agreements" with U.S. taxpayer-clients under which the bank agreed not to identify the U.S. taxpayers by name on bank documents, but rather to identify the U.S. taxpayers by code name, in order to reduce the risk that U.S. tax authorities would learn the identities of the U.S. taxpayers. ZKB understood that a primary reason why U.S. taxpayers sought these "code word" accounts was to evade detection by U.S. tax authorities.

- ZKB opened and maintained accounts for many U.S. taxpayer-clients held in the name of non-U.S. corporations, foundations, trusts, or other legal entities (collectively, "structures"), thereby helping those U.S. taxpayers conceal their beneficial ownership of the accounts. Some of the structures had no business purpose ("sham structures"), but rather, existed solely for the purpose of helping ZKB's U.S. taxpayer-clients hide their offshore assets.

- ZKB agreed to hold bank statements and other mail relating to approximately 750 accounts of U.S. domiciled taxpayer-clients at ZKB's offices in Switzerland, rather than send them to U.S. taxpayer-clients in the United States, which helped ensure that documents reflecting the existence of the accounts remained outside the United States and beyond the reach of U.S. tax authorities.

- ZKB issued checks for U.S. taxpayer-clients that were drawn on ZKB's correspondent account at a financial institution in the United States, which checks did not include a reference that the check had been issued at the request of a U.S. taxpayer-client of ZKB.

- ZKB allowed U.S. taxpayer-clients and third-party asset managers to make structured withdrawals by check from undeclared accounts in amounts of less than $10,000, in an attempt to conceal transactions from U.S. authorities.

- ZKB solicited new business through the website www.swiss-bank-accounts.com, which was operated by a third party, and which resulted in the opening of accounts at ZKB for U.S. taxpayer-clients whose accounts were undeclared.

<u>ZKB's Internal Policies Relating to U.S. Business and Examples of Contacts with U.S. Clients</u>

ZKB has never had branches, subsidiaries, affiliates, or operations in the United States. ZKB, however, took various steps to service clients based in the United States, and to assist U.S. taxpayers in maintaining undeclared accounts.

ZKB employees referred to herein as "relationship managers" served as the primary contact persons for ZKB's U.S. clients or their external asset managers ("EAMs"). Within ZKB's private banking operation in Switzerland, there was a group designed to focus on U.S. business, although relationship managers in other groups also managed U.S. taxpayer-client accounts.

Prior to May 2001, ZKB's policies permitted ZKB employees to travel to the United States to service United States-based ZKB clients. By way of example, in or about 2000 through early 2001, Otto Hüppi,[1] a relationship manager assigned to ZKB's North America Desk, traveled from Switzerland to the United States on three separate occasions to meet with potential ZKB clients in order to complete account opening documents. In May 2001, ZKB banned business travel to the United States.

Nevertheless, ZKB continued to service clients based in the United States. On numerous occasions, U.S. citizens traveled from the United States to Switzerland to open undeclared accounts. ZKB bankers met with these clients at ZKB in Switzerland, made copies of their U.S. passports, and opened new undeclared accounts for them. Bankers, including Hüppi, assisted

---

[1] Hüppi, who is no longer employed by ZKB, was indicted in December 2012 in the United States District Court for the Southern District of New York for his conduct at ZKB with respect to assisting U.S. taxpayer-clients in concealing their offshore assets from the IRS.

clients based in the United States in obtaining funds from their undeclared ZKB accounts while avoiding detection by the United States authorities. In or about 2004, 2007, and 2008, a U.S.-based client spoke with Hüppi by phone and requested that Hüppi send the client funds from the client's account at ZKB. Hüppi caused a check to be mailed to the client for approximately $8,000 on each of these three occasions, and the check was deposited by the client into the client's U.S. bank account. As further detailed below, the amount of the check was deliberately below $10,000 to avoid triggering U.S. bank reporting requirements.

The Qualified Intermediary Agreement

In October 2000, ZKB entered into a Qualified Intermediary Agreement ("QI") with the IRS. The QI regime provided a framework for non-U.S. financial institutions to report information relating to U.S. securities and arrange for tax withholding. The QI was designed to help ensure that, with respect to U.S. securities held in an account at ZKB, non-U.S. persons were subject to the proper U.S. withholding tax rates and that U.S. persons were properly paying U.S. tax. Under the QI, ZKB was generally obligated to identify and document any accounts that held U.S. source income, including for example U.S. securities, by collecting either an IRS Form W-9[2] for U.S. persons or IRS Form W-8BEN[3] or equivalent documentation for non-U.S. persons. Where account holders did execute a Form W-9, ZKB provided a copy of that form to its U.S. clearing house, even if the account holder did not, in fact, ultimately purchase U.S. securities.

ZKB's Awareness of U.S. Taxpayer Obligations Under U.S. Law and Its Aiding and Abetting of U.S. Taxpayer-Clients in Evading U.S. Taxes

At all relevant times, ZKB was aware that it was a crime under U.S. law for U.S. taxpayers to evade paying taxes and for ZKB to assist them in doing so. ZKB knew that certain U.S. taxpayer-clients were maintaining undeclared accounts at ZKB in order to evade their U.S. tax obligations, in violation of U.S. law. ZKB knew this, in part, because significant numbers of U.S. taxpayers entered into code word agreements and hold mail agreements when they opened their accounts, employed sham structures to hold their accounts, and expressly relayed concerns to ZKB relationship managers regarding their accounts being detected by the IRS.

ZKB was aware that U.S. taxpayers had a legal duty to report to the IRS, and pay taxes on the basis of, all of their income, including income earned in accounts that these U.S. taxpayers maintained at ZKB. Despite being aware of the U.S. taxpayers' legal duty, ZKB opened and maintained undeclared accounts for these taxpayers and knew that, by doing so, ZKB was helping these U.S. taxpayers violate their legal duties. ZKB was aware that this conduct violated U.S. law.

---

[2] The IRS Form W-9 is a tax form that identifies an individual as a U.S. taxpayer for U.S. tax purposes.

[3] The IRS Form W-8BEN is a tax form that identifies the foreign status of non-U.S. persons for U.S. tax withholding purposes.

ZKB understood the legal prohibitions regarding tax evasion to be distinct from ZKB's obligations under its QI Agreement. Certain ZKB bankers commonly used the term "Schwarzgeld"—German for "black money"—internally to refer to undeclared accounts, including those held by U.S. citizens. Until the middle of 2008, ZKB did not prevent any U.S. persons from opening an account if they refused to fill out a Form W-9, even though ZKB knew that such accounts were, or were highly likely to be, undeclared. Indeed, in May 2006, internal ZKB documents explicitly discussed the profitability of "[n]on-disclosed U.S. persons."

Efforts to Help U.S. Taxpayers Avoid Being Identified to the IRS Pursuant to ZKB's QI Obligations

ZKB offered, and its EAM partners recommended, that U.S. taxpayers use account features that would reduce the risk of U.S. tax authorities learning the identities of U.S. taxpayers who maintained undeclared accounts.

One such feature, as previously mentioned herein, was "code word" accounts, which were available to all customers regardless of nationality or domicile. The name of the account holder would not appear on any correspondence, account statements, communications, or notices. Between 2002 and 2010, ZKB maintained approximately 349 accounts with such code words for U.S. persons.

ZKB provided "hold mail" service, which was available to customers regardless of nationality or domicile. ZKB instituted a mandatory hold mail policy for U.S.-domiciled clients. U.S. domiciled customers with the "hold mail" service ensured that account statements, notices, or other documents associated with the account would not be sent to the customer's address in the United States. The customer's mail would remain at ZKB. Between 2002 and 2010, ZKB maintained approximately 750 accounts of U.S. domiciled account holders with "hold mail" service agreements. ZKB understood that one reason that code word accounts were opened with mail hold agreements was to assist the customer in not paying taxes.

ZKB also opened and maintained accounts on behalf of many U.S. taxpayer-clients held in the name of non-U.S. sham structures. ZKB treated these non-U.S. sham structures as the account holders, and accordingly did not require the submission of Form W-9s for these accounts. ZKB relationship managers understood that these structures could be used for tax evasion. ZKB relationship managers' knowledge that the accounts at issue were actually owned by U.S. taxpayers was demonstrated by a particular form in the account opening documents ("Form A") that was required to be maintained by Swiss banks under Swiss banking regulations and that set forth the true beneficial owners of the accounts in question. These Form As often identified U.S. taxpayers with addresses in the United States. The beneficial owners of entities were not asked if the accounts were declared or undeclared.

ZKB accountholders, including U.S. customers and EAMs, structured withdrawals by check from undeclared accounts in amounts less than $10,000 in an apparent attempt to conceal transactions from U.S. authorities. By doing so, it assisted U.S. clients in evading U.S. bank reporting requirements when the checks were deposited. For example:

- 60 checks in the amount of $5,000 each were debited between January 2008 and August 2009 to an account of a U.S. customer;

- 33 checks in amounts between $9,000 and $9,800 were charged to the account of a U.S.-domiciled customer between January 2008 and July 2009 and were sent to the U.S.

ZKB relationship managers involved in these activities were generally aware that U.S. clients requested funds be sent in multiple checks as a means of evading U.S. reporting requirements.

Certain U.S. taxpayer-clients of ZKB used the U.S. mails, private or commercial interstate carriers, or interstate wire communications to submit individual federal income tax returns to the IRS that were materially false and fraudulent in that these returns failed to disclose the existence of such taxpayers' undeclared accounts or the income earned in such accounts.

Individual relationship managers understood that the Swiss banking system, including ZKB, was helping U.S. taxpayers avoid paying taxes to the IRS, and that ZKB, by offering services like code word accounts and mail hold agreements, was assisting U.S. taxpayers in concealing this conduct. Although ZKB trained its relationship managers not to provide tax advice to foreign clients, individual relationship managers did discuss undeclared accounts with their superiors, who were aware that some U.S. taxpayer accounts were undeclared.

<u>ZKB's Collaboration with NZB and Receipt of U.S. Business Migrating From UBS</u>

In early 2008, U.S. enforcement actions against the Swiss banking institution UBS became public. In or about July 2008, UBS announced that it would cease providing cross-border private banking services to U.S.-domiciled clients. Rather than immediately closing down its own U.S. taxpayer undeclared accounts as a result of the UBS investigation, ZKB, through its EAM desk, instead treated UBS's decision to stop accepting U.S. taxpayer-clients as a business opportunity, and actively sought to increase its U.S. taxpayer-client base. ZKB gained many U.S. taxpayer-clients through EAMs working with the bank.

ZKB took on many new U.S. taxpayer-clients in 2008 through Neue Zürcher Bank ("NZB"), an EAM based in Zurich, Switzerland. Although NZB had a Swiss banking license and was supervised by the Swiss Financial Market Supervisory Authority ("FINMA"), it did not itself maintain client accounts. Rather, like other EAMs, it opened accounts on its clients' behalf at other custodian banks and managed their assets. In late 2001, NZB and ZKB established a relationship in which ZKB served as the custodian bank for NZB clients. In March 2002, ZKB and NZB entered into an EAM agreement.[4]

---

[4] In 2005, ZKB delegated to NZB the "know your customer" ("KYC") and anti-money laundering ("AML") verification processes. Until that time, ZKB had conducted the KYC verification for clients managed by NZB. According to an employee at ZKB's EAM desk, in practice, NZB did not make use of the delegation if the accountholder was a structure, and ZKB would then handle the account opening directly with the structure's representatives.

In or about June 2008, Hansruedi Schumacher, a senior employee at NZB, met with, among others, the head of ZKB's EAM desk, another ZKB department head, and a manager within ZKB's EAM Desk. During the meeting, Schumacher informed ZKB that he was hiring five former UBS employees because UBS was exiting relationships with U.S. clients. NZB would be opening accounts for former UBS clients at three Swiss banks, including ZKB. At this meeting, Schumacher and ZKB officials discussed new clients that would be coming to ZKB from UBS as a result of ZKB's relationship with NZB. ZKB subsequently chose to work with NZB to take on new U.S. taxpayer-clients who were being forced to close down their accounts with UBS. Both during this meeting and during subsequent conversations with NZB, it was made clear to ZKB officials that many of the U.S. taxpayers who were closing down their UBS accounts and transitioning to ZKB had undeclared accounts and were not in compliance with their U.S. tax obligations. Indeed, during the June 2008 meeting, there was a discussion about whether ZKB might be placing itself at risk by taking on these UBS clients. Schumacher assured ZKB that the problems faced by UBS would not be a problem for ZKB because, among other reasons, the use of an intermediary EAM sufficiently insulated ZKB.

Between 2000 and 2010, approximately 489 U.S. clients of ZKB were managed by EAMs. Between 2002 and 2009,[5] NZB alone introduced 349 U.S. taxpayers to ZKB, including many U.S. taxpayers who previously held accounts with UBS. Of these 349 U.S. taxpayers, approximately 30% were nominally held by non-U.S. sham structures.

<u>ZKB Begins to Wind Down Its U.S. Business in Response to the UBS Investigation</u>

In 2008 and 2009, at the same time as ZKB's EAM Desk proactively sought to increase its U.S. taxpayer-client base, ZKB also began implementing a number of measures that gradually limited securities accounts held by U.S. taxpayer-clients. At first the restrictions applied only to former UBS clients, but, as detailed below, ZKB expanded its restrictions over time.

As of June 2008, ZKB's Private Banking Unit began to require that new clients who were U.S. nationals or U.S.-domiciled and who were transferring securities accounts to ZKB from UBS submit a Form W-9, which allowed ZKB to determine whether the U.S. clients were compliant with their U.S. tax obligations. This policy, however, did not apply to U.S. clients who held their accounts via an EAM, such as NZB, or to U.S. clients with cash accounts (*i.e.*, accounts that held no securities and contained solely cash holdings). This was so even where the account opening documents (*i.e.*, Form A) for an EAM client indicated it was held by a U.S. beneficial owner.

In September 2008, this policy was expanded to apply to ZKB's EAM desk, which began implementing the Form W-9 requirement for new clients coming from UBS via an EAM. It was soon extended to new securities accounts for all U.S. national or domiciled clients, and not limited only to former UBS clients. As early as November 2008, ZKB's Supervisory Board had recognized that existing relationships with U.S. clients might need to be dissolved. Nonetheless, at that point, there was no scrutiny of existing NZB accounts for tax compliance.

---

[5] In April 2009, ZKB decided to terminate its business relationship with NZB.

In April 2009, ZKB further restricted its services to U.S. clients by not accepting any new securities accounts for U.S.-domiciled clients, whether or not the client provided a Form W-9.

In June 2009, ZKB decided to close its business with all U.S.-domiciled clients holding securities accounts. ZKB began implementing this decision in August 2009 by sending letters to U.S.-domiciled clients announcing its new policy. The letter announced that "[i]n the future, the bank will only serve clients who are domiciled outside the U.S. . . . The bank therefore terminates hereby your banking relationship and all related services." Between fall 2009 and September 2011, ZKB made 100 exceptions to this policy for U.S.-domiciled clients with a Form W-9 and connections to Switzerland.[6]

For U.S. clients domiciled outside of the U.S., ZKB sought a Form W-9 so that it could determine that the U.S. clients were compliant with their U.S. tax obligations.

In 2011, ZKB decided to exit its business with all remaining U.S.-domiciled customers (*i.e.*, customers having only cash accounts, subject to the limited exceptions mentioned). By 2012, ZKB had closed virtually all accounts held by U.S. domiciled taxpayers, other than dormant accounts and a small number of accounts that were in litigation or otherwise required to be maintained by Swiss law.[7] For those U.S. clients domiciled outside of the U.S., ZKB sought a Form W-9 and proof of U.S. tax compliance (*i.e.*, an annual Report of Foreign Bank and Financial Accounts ("FBAR") filing with the IRS).

At this time, ZKB has terminated all U.S. cross-border business. It does not accept new U.S. domiciled customers and has exited over 1,090 existing U.S.-domiciled customers. Additionally, ZKB has terminated its relationships with EAMs that managed accounts of U.S.-domiciled customers.

<u>Indictment of ZKB Employees and ZKB's Response to the Indictment</u>

Since 2011, ZKB has provided substantial cooperation to the United States Attorney's Office in its investigations of U.S. taxpayers holding undeclared accounts. ZKB's cooperation has consisted of, among other things, producing records relating to the management of the U.S. cross-border banking business, documents concerning the transfer of funds to and from ZKB on behalf of U.S. taxpayers, descriptions of particular practices and account relationships, and statistical information related to U.S. taxpayers and the U.S. cross-border banking business. However, ZKB also understands that the United States views the actions of ZKB, as described below, as inconsistent with a policy of full cooperation, and that those actions have reduced the amount of cooperation credit afforded by the U.S. Attorney's Office to ZKB.

---

[6] These exceptions included non-U.S. citizens whose stays in the United States were temporary; clients with fixed mortgages; and inheritances with a non-U.S. descendent.

[7] As of May 2015, approximately 21 such U.S. clients remained.

In December 2012, three ZKB bankers – Stephan Fellmann, Christof Reist, and Otto Hüppi – were charged in the Southern District of New York with conspiracy to defraud the United States and the IRS for their role in ZKB's offense.

Shortly after their indictment in December 2012, ZKB determined that it was possible that a conflict of interest would develop between ZKB and the three bankers, Hüppi, Fellmann, and Reist. As a result, ZKB provided each defendant with independent United States counsel.[8] ZKB also moved Reist and Fellmann to new roles within ZKB where they would have no client contact and imposed restrictions on their travel outside of Switzerland.

Despite ZKB recognizing that a conflict might develop between the interests of ZKB and the interests of the individual bankers – and retaining independent U.S. counsel for the bankers as a result – beginning in 2013 and continuing through 2015, ZKB's in-house counsel, at times joined by employees from ZKB's Human Resources Department and other departments, regularly met with Fellmann and Reist. At those meetings, ZKB's in-house counsel discussed with Fellmann and Reist, among other things, substantive and strategic matters relevant to the pending United States criminal case, as well as job placements and career development. During these meetings – which were not attended by Fellmann or Reist's respective independent U.S. counsel – ZKB's in-house counsel informed Fellmann and Reist that it was the bank's view that they should wait to resolve their criminal cases in conjunction with ZKB reaching a resolution with U.S. authorities, because it would be in the bankers' best interests to resolve their cases along with the bank rather than separately. Fellmann and Reist felt dissuaded by ZKB's comments from reaching out to the U.S. Attorney's Office to explore the possibility of cooperating with the United States. Indeed, on at least one occasion, ZKB's in-house counsel suggested to Fellmann that the bank did not believe he had any information of value to contribute to the U.S. Attorney's Office's ongoing investigation of ZKB. In fact, ZKB understands that the U.S. Attorney's Office considers information provided by Fellman and Reist to be of value, and it would have furthered the investigation of the bank and other individuals. In addition, over time, based on conversations with ZKB, Fellmann and Reist felt that their continued employment at ZKB and ZKB's ongoing payment of their legal fees would be threatened should they take steps that were viewed by ZKB as inconsistent with the bank's own interests. Due in part to these discussions, Fellmann and Reist did not seek to cooperate with the United States until the summer of 2015.

The Impact of Undeclared Accounts on ZKB's AUM, Fees, and Profit

ZKB's conduct with regard to undeclared accounts allowed it to increase the undeclared U.S. taxpayer assets that it held, thereby increasing its fees and profits. ZKB increased the AUM that it held for undeclared U.S. taxpayers from approximately $289 million in 2002 to approximately $794 million in 2008, its peak year in regard to undeclared AUM. In total, ZKB had approximately 2,000 undeclared U.S. taxpayer-clients, including those who held accounts through structures. ZKB earned approximately $21 million in profits on approximately $24 million gross revenues from its undeclared U.S. taxpayer accounts, including accounts held through structures.

---

[8] Hüppi at this time was already a former employee of ZKB. Fellmann and Reist remained employed by ZKB.

ZKB admits that the U.S. taxpayers it assisted in this manner evaded over $39 million in U.S. taxes that it understands remain unpaid as of the date of this Statement of Facts.

ZKB agrees to pay $39,142,000 in restitution, $24,266,300 in forfeiture, and a fine of $35,125,260, for a total of $98,533,560, for the tax years 2002 through 2013, as result of the conduct described herein.

# Exhibit D
# to the Deferred
# Prosecution Agreement